1

**FEE PAID**

Name: Kimberly Clisbee

Address: 3531 Springridge Way

Palmdale Ca, 93551

Phone: 661-471-0015

Fax:

In Pro Per

**F I L E D**

CLERK, U.S. DISTRICT COURT

## SEP 17 2023

CENTRAL DISTRICT OF CALIFORNIA

BY: _____ rsm _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Kimberly Clisbee and Christopher Co

Plaintiff

v.

County of Los Angeles et al

Defendant(s).

CASE NUMBER:

**2:23-CV-07844-SB-RAOx**

To be supplied by the Clerk of
The United States District Court

**COMPLAINT**

This case is currently in State Court 22STCV30030. It is being manipulated by USC and USC investors to prevent the doctors and other defense from prison for federal insurance fraud, racketeering, and organized crime. These individuals are responsible for creating a disabled population for the Reginal Center and California Child Services to gin funding through a study called the CCS redesign model run by USC and led by Los Angeles County chief pediatric medical physician Dr. Edward Bloch from 2010 to 2019, when the State of California made both programs part of the State healthcare system, making USC and La County investors trillions of dollars a year in insurance fraud. My daughter and her father were both victims of this fraud and have been slaves to the county medical industry for over 13 years. The violations suffered by my family are color of law crimes, multiple counts of medical battery, coercion, intimidation, retaliation, and threats from the LAPD, doctors, and even the district attorney's office in 2016. I can prove this beyond a doubt with my documents, witnesses, and child. She has a dozen doctors who will tell the courts this is true, but the State court obstructs justice, allowing USC judges to twiddle this case down to appear as "malpractice." However, several organizations, including but not limited to LA County, USC, Children's Hospital Los Angeles, Children's Hospital Orange County, Hopkinton Memorial, St Joseph's, UCLA, the Regional Center, the local school district, and countless vendors, all decide to either cause or turn an in the Stanley Mosk Courthouse under civil action 22STCV30030. There are multiple complaints to the Judiciary Council because of the use of USC judges who allow this misconduct and refuse to comply with the law and remedy. (Cont)

This is an emergency. In this case, the child is being denied access to healthcare, FAPE, and all ADA rights and is suffering retaliation. She could die because of these monsters; I am trying to prevent that. We filed for an ex parte hearing, and the judge overseeing the Honorable Cheryl Nellen agreed to hear it. This has been dragging on for over a year because of judiciary corruption, costing my child valuable time. She could die.

Then, just like my case management hearing the week before, Judge Nellen had an emergency (only that day) and could not. I believe she had an emergency twice because life is life. However, I also don't because she pushed my case management hearing back two months and allowed six demure and other objection hearings by the defendants to be heard a month before the case management hearing when she knew this was an emergency, already said my case had merit, and that what the defendants were objecting to was not legitimate just an effort to obstruct justice. She turned my ex parte request over to a USC judge, Fahey, who let the LAPD Gange unit go, and of course, he denied it within a few hours of receiving it, not enough time to read all the materials. The defense attorneys knew the judgment before me and did not attend court.

**Facts of this case**

• The defendants targeted my child for abuse during pregnancy and caused her global disabilities.

• The defendants do not deny their actions because I have overwhelming proof and many expert witnesses who will testify. The witness list and documented proof are in the 22STCV30030 documents.

• I was told about the fraud on September 3, 2019, by Dr. Arie Fallah, director of UCLA pediatric neurosurgery, in front of three witnesses, and filed on September 12, 2022. He named UCLA, CHLA, Quest Diagnostics, the county, and all the hospitals as constitutes and did call this organized crime.

· Associated injuries from the Gorman Elementary School, Antelope Valley Learning Academy, and Regional Centers have been settled through Federal Hearings and mediation.

· The Office of Civil Rights found multiple violations in school due to retaliation associated with this case and is negotiating a resolution on our behalf.

· We had a fair hearing regarding The North Los Angeles County Regional Center and its involvement and civil rights violations. That case is also in resolution in favor of us.

· The fact that the Federal government is owning up to its part in this and offering restitution when it suffers the most significant fraud should be noted. My child is not the only one who did this. It takes thousands to create a testable population to gain billions of dollars in government funding.

· Attached is my second amended complaint to clarify my accusations, as it is multifaceted and involves 36 defendants over a decade of abuse. One disabled child makes the system millions of dollars a year in medical appointments, treatment, special education, and on. USC owns all these services and treats CHLA like a WWII concentration camp for unjust gain; someone must stop them.

## INTRODUCTION

1. This action concerns the egregious misrepresentation and omissions of the defendants, Los Angeles County, Dr. Edward Bloch, Children's Hospital Los Angeles, Dr. Mark Krieger, Dr. Leigh Ramos Platt, and Dr. Anat Erdreich-Epstein, who intentionally caused the plaintiff's only child Leilani Kathryn Co Global disabilities by knowingly lying about the child's medical condition that was clear before birth, concealing the truth for over a decade, and conducting several "non-procedural" brain surgeries under the misdiagnosis of congenital stage two brain cancer that left the child unable to walk, talk, eat, or function both physically and socially like a toddler.

2. Leilani had a dozen surgeries due to this fraud and will have many more throughout her life. She may even die. It is hard to tell. Her condition was purposeful, so she developed unusual conditions for short periods. Disorders like diabetes incipits or precocious puberty, lifelong conditions for most children, happen to Leilani for a month or two after her brain swells or bleeds from the pressure from not having a shunt. She has one now, but it is hard to know what is next because a vital nerve was purposefully and unnecessarily severed during her hemispherectomy surgery to increase the likely hood of never recovering and developing problems throughout life. She was surgically made to be in pain, to have surgery, and needed medicine and other treatments. To feed the system. They sentenced her to a life of torture, and I die inside just thinking about it. I am so scared for her future. She did not deserve this. Moreover, they make her feel less in school by harassing her, discriminating, and violating FAPE and ADA federal laws. Leilani deserves to be free of this torment.

3. Leilani was not the County's only victim. Leilani's father and plaintiff, Christopher Co, was also misdiagnosed with Stergg Webber disorder when, at one glance, it was prominent that Chris had Tuber Sclerosis by every doctor who saw him. They know right away. When I asked Hopkinton Memorial to conduct a Tuber Sclerosis Test, they said they could not. Same as CHLA and CHOC. When I asked them to draw blood and a currier would come and get it, they killed the sample three times. When I stood there and waited for them with a carrier while they drew it, Chris could suddenly go to UCLA, and his doctor retired. Before that, he was told by his Regional Center worker, who managed his healthcare for him, that because he had Medi-Cal and Medicare, the county would only let him go to Hopkinton Memorial Hospital in Pasadena and had to see Dr. Ross, the same thing the county did to Leilani.

4. Chris also had brain surgery arranged by the county in 2009. The Regional Center, where Dr. Bloch was the chief executive, arranged it. The Regional Center made Chris an appointment at Hopkinton Memorial in Pasadena, where he was to have exploratory surgery to see why he was having seizures. He was promised he could return to work and his life would not be altered but improved. They told him he had a craniotomy, but in 2013, he was told by Dr. Mathers at UCLA that they had removed his temporal lobe. We believe this was the motivation behind Leilani's victimization. It is difficult to imagine Leilani's fraud was not planned based on the fraud the county committed against Chris.

5. The most apparent evidence that Leilani never had cancer is that she is alive when the fatality rate for congenital Gemistocytic astrocytoma is 3-5 years, and Leilani is 13. Some patients live up to ten years after surgery, but those patients receive chemotherapy and

radiation treatment and don't have multiple surgeries. Leilani did not receive chemotherapy and had four surgeries before her first birthday.

6. Leilani is also exceptionally healthy. Her labs are ideal; she is not allergic to anything, and her only medical conditions come from her brain injuries. Leilani has only had four colds in her entire life. She has never had an ear infection or any other type and never contracted COVID-19. It's not typical for a cancer survivor. Cancer survivors, especially young children, have weak immune systems and are always in and out of the hospital. Leilani has a superior immune system like her parents.

7. According to the research, Congenital brain tumors (CBTs), defined as tumors presenting within 60 days after birth, are sporadic and account for only 0.5–1.9% of all pediatric brain tumors. Congenital brain tumors generally have a poor prognosis, with overall survival of only 28% for fetuses and neonates.

8. If Leilani had this type of cancer, she would have been given chemotherapy and radiation after the first surgery was unsuccessful, at the very least. Four brain surgeries were done under this diagnosis without one round of chemotherapy.  Suggesting the defendants were aware Leilani did not have cancer.

9. Dr. Krieger, CHLA (Represented by a dozen doctors, social workers, nurses, and executive staff, etc.), the county, Dr. Platt, and Dr. Epstein all agreed Leilani had a congenital Gemistocytic astrocytoma and needed a hemispherectomy and decided Dr. Kriger should do the surgery, knowing he was not qualified or certified, making it difficult to believe all parties were not aware of Leilani's fate before they hurt her and that they were making

promises to get me to agree so they could proceed in causing her injuries for their unjust enrichment.

10. The promise to conduct a hemispherectomy, knowing the outcome was 98% recovery and not doing it so they could profit, is promissory fraud, a breach of contract (not a cause of action in this case but a fact), and gross negligence for unjust enrichment.

11. All defendants concealed the truth, never wavering. Except for Dr. Epstein in 2016-7?, who said at our last appointment, "It might not be accurate. We can take the cancer diagnosis off the record if you like." Before quickly retracting and then never seeing Leilani in the clinic again.

12. After Dr. Epstein's comments, Dr. Platt and Dr. Kriger brushed it over and said she just meant it was hard to tell, but we are sure it is both cancer and TSC. They maintained their lie by concealing the truth even when asked directly. I did not ask again until Leilani fell sick in 2018.

13. When Leilani was sick in late 2018 and needed shunt surgery or would die. Dr. Bloch and Dr. Kriger planned to let her based on their actions.

14. Leilani's body temperature was 94-95 for two straight weeks, indicating hypothermia and potential for cardiac arrest. But Dr. Krieger told us that instead of the annual MRI coming up next month. He was changing her schedule to every three years. He knew she would die, which was his intention based on his response.

15. Dr. Krieger's actions were malicious and grossly negligent because he knew Leilani suffered tremendously from his first unethical surgery, then did it again. Dr. Krieger is

psychologically capable of cutting up a baby's brain multiple times and causing permanent

damage, for-profit and occupational gain, then seeing his tiny victims and their families in

the clinic and acting like nothing ever happened. This should be of great concern.

16. all defendants are guilty of ***mens rea actus reus,*** proven by the previously stated facts.

17. The county and Dr. Bloch targeted Leilani for fraud before birth, making their actions

premeditated, intentional, and negligent.

18. Dr. Krieger and his counsel used deceit and underhanded practices to get their colleagues in

law enforcement to harass the plaintiffs when Dr. Krieger was confronted via email about

Dr. Fallah's confession that exposed his crimes.

19. When I contacted Dr. Platt for help, Dr. Kreiger's attorney had Detective Cruze from LAPD

threaten me. This is not the actions of innocent people.

20. Dr. Fallah at UCLA told us in 2019 that after conducting the life-saving shunt surgery,

Leilani never had cancer, and the injuries to her brain seemed purposeful from a medical

perspective. Still, they did not have the records or pathology at UCLA, and we were

immediately banned from the Department of Neurology and Neurosurgery. Told we had to

go back to CHLA or Lo Malinda.  Out of fear, we chose a hospital seven hundred miles from

Los Angeles, Stanford.

21. I immediately requested Leilani's medical records from CHLA. It took me over a year to get

them. Because of COVID, it wasn't easy to get new patient appointments. In 2022, Leilani

entered Stanford Medical, and her genealogist, Neurosurgeon, and neurology team reviewed

all the records. The records confirmed that she did not have cancer and only had TSC.

Furthermore, if Dr. Kriger (or a qualified surgeon) had conducted the originally contracted hemispherectomy, it would have been all Leilani needed because her disabilities are explained by MRI imagery, medical records, her condition, abilities, and the style/aggressiveness of the surgeries. I filed my complaint in September 2022, five months after the Stanford doctors confirmed Dr. Fallah's accusations.

22. Due to this fraud, Leilani will need medical treatment for the rest of her life and could potentially die. If Leilani does survive this, she will suffer for the rest of her life in multiple ways, including emotionally, socially, and psychologically, not just physically and medically. However, new medical conditions are arising from the fraud, so she will have to undergo many more surgeries in her life as a result. The defendants stole her life and sentenced her to a life of pain and suffering beyond anything humanly imaginable.

23. We seek a settlement in this situation over a trial because Leilani cannot get the healthcare she needs to survive her injuries, is being denied FAPE so she cannot go to school, and is depressed because she is unable to socialize with peers, go to school like the other kids, or have a life outside of the home. The defendants have already consumed 13 years of Leilani's life; they cannot have another, and she may not survive much longer if she cannot establish a cohesive medical team. And the possibility of that in California is exhausted. We need to move her now. We seek damages no less than one hundred fifty million dollars, appropriate for the injuries and loss sustained by the plaintiffs.

24. The plaintiffs now bring this action and seek to be made whole for the damages directly caused by Defendant's wrongdoings.

## Facts and Background

Dr. Samantha Hann is not part of this case but will be added if this case goes to trial. She is a crucial component of the fraud because the plaintiff believes it began with her.

25. Dr. Hann knew Leilani had a 7cm brain tumor because she ordered weekly ultrasounds every week for the last two months. She said the ultrasounds were to monitor my placenta previa, but it would be impossible not to see a golf ball-sized tumor in the skull the size of a grapefruit.

26. I told Dr. Hann in the beginning that if there were a problem with my pregnancy, I would go home to Boston immediately as I had just moved here and have my entire family there for support. I believe Dr. Hann withheld the truth to prevent me from returning to the East Coast because the fraud was already planned.

27. We were denied a 3-D ultrasound and told by the ultrasound technician at St. Josephs that he was looking at fluid around the brain, but then said it was okay nothing to worry about. If he was looking at the brain, it is impossible that he missed the golf ball-sized tumor inside, which is an intentional misrepresentation. We have sonograms that may have the tech's name on them for subpoena purposes.

28. Three weeks before giving birth, we were told the county wanted us to have our baby in Palmdale because we just moved to the family's second home there, and it was the law that you could only have your baby in the city where you live. This is not true, and we still owned property in Burbank, but it did not matter. We were told that because we were on Medi-Cal, allowing Leilani to be born in a hospital where the "upper class" have their

children would not be appropriate and that we had to go to a county hospital. After refusing

to give birth in Palmdale, we were allowed to go to Glendale Memorial.

29. an unidentified county doctor was there to observe Leilani's birth, which seemed odd.

30. An official from the Department of Public Healthcare Services contacted Glendale Memorial

on Saturday, 8/28/2026, after one uneventful seizure and MRI that only showed a mass and

told Dr. Parks, Glendale Memorial pediatric lead on duty, and informed her we did not have

a choice in hospitals, that Leilani could only go to CHLA. When asked about UCLA, she

was told no. Government offices are open on the weekends, and it is not practical to assume

the county did not know what was going on with Leilani and had intended to injure her

through surgery based on their actions.

31. I would not be released until Monday, 8/30/2010, more than 24 hours after Leilani. There

was no reason to keep me admitted. My catheter was removed on the 27th, and my vitals

were good. There was no medical or legal reason to imprison me in the hospital, but I was. I

was told I could not sign out of the hospital because I was being held on county orders.

32. All the doctors involved at CHLA, including the defendants, assured Leilani that she had

brain cancer and would receive a hemispherectomy with a 98% recovery rate based on

medical history. They intentionally misled us into believing Leilani had cancer and that they

intended to help her by conducting a hemispherectomy to gain our trust. However, they did

not stick to the contract.

33. Dr. Kriger agreed to a procedure he had no experience or authorization to perform (to his

admittance a year after the first surgery), then waited until our child was in the operating

room before telling us he had changed his mind and did not want to do the surgery as

planned, adding CCS (specifically naming Dr. Bloch) was refusing to permit him to conduct

that surgery anyway. It is not possible that this interaction with the county happened in the

operating room. Dr. Krieger already knew he would injure Leilani for fraud before doing it.

34. Dr. Platt misled us to believe Leilani had both cancer and TSC, knowing she did not,

because Leilani was never treated for cancer. Dr. Platt, a neurologist who works closely with

Dr. Rossen, the TSC expert in the TSC clinic in Dr. Platt's department insisted CHLA could

not test for TSC and refused the diagnosis until Leilani's father was also tested. Knowing

there is a TSC clinic and Dr. Platt's mentor, Dr. Zupanc, is also a TSC specialist at CHOC

(who also refused to test Leilani for TSC) makes it hard to believe Dr. Platt did not know

Leilani had TSC, especially with her father having all the symptoms.  There has not been a

neurologist since that cannot see the TSC at first sight, so Dr. Platt must have known, given

her training and the existence of the TSC clinic in her office.

35. Dr. Epstein got very nervous and was willing to change the diagnosis from cancer to TSC

when I confronted her in 2016-7. She retracted her comments as fast as she said it and

refused to see Leilani moving forward.

36. Every doctor who has seen Leilani or reviewed her record agrees we were intentionally

misled based on the medical records because her condition was apparent and cancer never

unfounded.

37. Dr. Bloch infused himself into Leilani's life like a parent. He controlled her medical care,

school, and regional center services. He was everywhere. There is no reason for a county

official to be this involved in one child care. I never had a social worker, but I assume this

would be their job, not an official, unless Leilani were significant to him, like a study sample. He is responsible for thirty million other children in Los Angeles County, yet he was personally involved in every aspect of my child's life, which is not just odd. It is unheard of. Officials don't get personally involved with citizens unless something unofficial is happening.

38. Dr. Bloch's assistant misled me to believe that if I did not follow orders, I would go to jail or Leilani would lose her healthcare, so I never tried to get help. I was too afraid of what would happen. So, I continued my law enforcement education to protect myself. When Dr. Fallah told me the truth in 2019, I had a few degrees under me and felt confident they could not imprison me or take Leilani away without justification, so I started to fight.

39. When Dr. Kay at CHLA refused to fix Leilani's dislocated hip, we requested a referral to UCLA. We were told we could not go to the main hospital on the UCLA campus at first. We were told we had to see Dr. Thompson on the USC campus, even though she was a UCLA doctor and had an office in Santa Monica, where Leilani saw Dr. Oppenheim twice to be fitted for a back brace.

40. Dr. Thompson was upfront that she worked closely with Dr. Bloch and CCS from the very beginning but understood what happened at CHLA and why I don't want to have anything to do with him (she tells me) but ended up injuring Leilani on his behalf to create a physical disability that looked like CP because she has a normal skeleton before Dr. Thompson altered her and made Leilani CCS eligible in 2019.

41. Dr. Thompson told us Dr. Bloch would not allow Leilani to have a prosthetic hip. She needed to makeshift one from bone, but not cadaver bone, because of Leilani's weak immune system, her own, so she does not get an infection.

42. I told Dr. Thompson Leilani that she does not have a weak immune system, and she said CCS said she did, so she has to go by Dr. Bloch's report. Dr. Bloch also gave Dr. Thompson a false APGAR of 4 to justify cutting three inches off her healthy leg and sinching up her muscles and ligaments to cause skeletal deformity. The score is included in the evidence in the original complaint. Dr. Thompson then wrote Leilani a prescription for a stander so her legs could stay strong. We still do not have that stander. The vendors keep sending us large adult stander instead of youth for three years. The Regional center is also a player in this game, promising us a stander for 3 IPPs without providing one. Dr. Bloch runs the Regional Center Leilani depends on, so that is why.

43. Leilani was sexually battered by a nurse with a catheter tube following that surgery. The doctor who ordered the attack, Dr. Gayley, also refused to give Leilani proper bandages earlier that day. Instead, he took a giant piece of industrial construction foam. He ran it the length of her incision (10 inches ). When her home nurse removed the incision and came with it. Our nurse, Gel was horrified and took pictures and reported them to ASAP Home Health, where Leilani is a client.

44. many other situations are attached to this fraud and can be read in the original complaint or heard in the recorded depositions.

## CAUSE OF ACTION

### FIRST CAUSE OF ACTION

### FRAUD-INTENTIONAL AND MISREPRESENTATION

### (By the plaintiff's Kimberly Clisbee against all defendants)

45. Chris was told he could not go to a hospital other than the one the Regional Center chose.

46. Chris did not consent to have his temporal lobe removed

47. Chris was never told his temporal lobe was removed.

48. Chris was promised the surgery would stop his seizures so he could enjoy life.

49. Chris was told he would be able to work again.

50. Dr. Hann hid the 7cm tumor growing in our child's head to keep us from moving to Boston or getting a second opinion. I believe this because I told her that is what I would do if there were any issues.

51. Dr. Hann told me the county had a say in where I gave birth. I could not have Leilani in the Providence Saint Joseph Medical Center, where I received all my care up to that point, even if they do accept Medi-Cal insurance for service because of my socio-economic status. I had to choose a county facility, not a major hospital. They gave me two options, Palmdale or Glendale Memorial, the only hospitals I could go to for medical care with Medi-Cal insurance. Which I now know is not valid. I can go to any hospital so long as Dr. Bloch does not interfere from the administrative end.

52. The county was involved in Leilani's care and planning what hospital she would go to for "unknown" medical care on a Saturday. First, the county does not get involved in such a capacity. The hospitals transferred patients where the appropriate specialist was. Their first choice for Leilani was UCLA, but Dr. Bloch insisted on CHLA on a Saturday. The county

does not get involved in that. Your insurance either pays or doesn't, but they have nothing to do with emergency care for an infant. Second, Dr. Bloch is an official. Does he have direct communication on every birth in the county from the moment the child is born and is making these decisions for all thirty million citizens? Of course not. So why was he so involved in mine?

53. I was forced to stay in Glendale Memorial for more than 24 hours after Leilani was sent to CHLA for no medical reason. The county remanded me there, and I could not sign myself out.

54. I was told Leilani had to get her insurance before medical treatment could be given, and it would take a month, so she had to wait for CCS approval before she could have surgery. However, newborns are covered under their mother's insurance, so why could she not use mine?

55. Dr. Platt, with the help of Glenda, the hospital's social worker, assisted in forcing us to sign up for CCS, knowing Leilani did not have a CCS-eligible condition.

56. The county and CHLA both told us that we had no choice but to have a CCS case manager (Dr. Bloch's assistant) dictate every step of Leilani's medical care and county services because we could not care for our child. She would not get surgery or aftercare without CCS, which helped Dr. Bloch control Leilani in every way to get the data he needed for the CCS redesign project. Nothing about my history or background suggests I am incapable of anything, nor is there a history of being in the system, crime, or unemployed aside from transitioning from one job to another or anything but credentials and awards. There was no reason to force me into social servitude. Dr. Bloch just wanted to keep his eye on her and his foot on my neck.

57. Dr. Krieger waited until Leilani was in surgery and prepped before coming to us and telling
    us he would not perform the surgery as planned.

58. By denying a VP shunt in an infant that already had an observation, hydrocephalus was
    inevitable, and once it causes damage in an infant, there is no reversing it.

59. Dr. Krieger refused to do one surgery over three and never followed the procedure by
    draining correctly, knowing the outcome.

60. Dr. Krieger's second major brain surgery was done as an "outpatient," and Leilani was
    forced to leave with extreme signs of hydrocephalus. He then refused to correct it and
    watched the hydrocephalus deteriorate Leilani's brain for nine long months.

61. Dr. Platt told us in May 2011, when I consulted her about going to Boston for a second
    opinion, that Dr. Krieger did not initially conduct the hemispherectomy surgery as planned
    because he was not certified but wanted the opportunity to attempt the surgery for the first
    time with Leilani. This admission proves Dr. Platt was also aware of the fraud. Dr. Krieger
    knew he was not going to do the surgery before agreeing to it, and instead chose to conduct
    malpractice for profit instead of sending Leilani to UCLA where (according to UCLA
    director of pediatric brain surgery Dr. Arie Fallah) CHLA typically sends patients who need
    this procedure. Dr. Krieger admitted to this.

62. Jeanne Umana, Dr. Bloch's assistant, said we could only see Dr. Krieger's assistant, Mona
    Shah, as a pediatrician and that we were not allowed to see a pediatrician at CHLA or any
    doctor Dr. Bloch has not personally approved.  The idea was to keep her in the circle of
    people Dr. Bloch and Dr. Kriger trusted with their crimes. The same reason Dr. Platt sought
    out Dr. Zupanc to organize Leilani's hemispherectomy at CHOC when Dr. Krieger's truth

about not being certified was revealed. She is her mentor and taught her everything she

knows. Corruption included, based on my experience.

63. Dr. Bloch started the CCS-Redesign project in November 2010, a month after Leilani's

brutal surgery.

64. Dr. Bloch chose and monitored everything in Leilani's life, from the Regional Center to the

hospital, schools, and vendors. They all referred to Dr. Bloch as "keeping Leilani under a

microscope" and being the decision-maker for all her services, including school. As a

researcher myself, this is called "controlling the sample" to ensure the desired outcome.

65. after gushing over the medical phenomenon known as my child, Dr. Epstein asked me to

sign off on a study and told us they needed her tissue sample for future research and that the

result would be shared with doctors worldwide. She played this up so high that she even

referred to Leilani as a celebrity cancer patient. But when Dr. Wu from UCLA asked for a

sample to test for cancer, she was told it was disposed of directly after surgery.

66. Dr. Krieger, Dr. Rosser, and Dr. Bloch knew Leilani was dying in 2018 and refused to let us

switch hospitals, fearing a doctor would tell us the truth, which they did, Dr. Fallah.

67. Dr. Bloch was still interfering with Leilani's access to healthcare at UCLA via administrative

authority at the Department of Healthcare Services.

68. Leilani's Regional Center, CCS, Department of Healthcare Services, and county records

before 2019 have been deleted.

69. Dr. Fallah, director of UCLA pediatric neurosurgery, confessed what he knew about this

crime and assured us it was intentional based on the medical history he could see and the

MRI images, which he said are all you need to know the truth.

70. They were very convincing. They knew I was at their mercy and didn't understand what was happening.  They knew I believed they would never hurt her as I told them I trusted them repeatedly because I should be able to trust doctors will not brutalize a baby. Because who would do such a thing? It was brain cancer surgery, and I was a terrified new mother. I wanted to believe what was supposed to happen was happening.  No one could imagine or suspect humans could do this to babies, never mind doctors. They all said the same things, so I believe them because they all agreed, were always polite, and acted professionally. I trusted them, and they knew it and took advantage.

## SECOND CAUSE OF ACTION

## FRAUD– PROMISSORY

### (By the plaintiff's Kimberly Clisbee against all defendants)

71. Chris was promised the surgery would stop his seizures so he could enjoy life.

72. Based on Leilani's condition, a hemispherectomy and shunt is the standard procedure and results in 98% recovery.  Sticking to the contracted procedure would have saved Leilani's life and not left her with physical or intellectual disabilities. The only medical reason doctors can see for the ones she has is the numerous aggressive and inappropriate surgeries.

73. CHLA agreed to perform a hemispherectomy. Dr. McCombe was to perform the surgery but handed it to Dr. Krieger, who he knew was not qualified.

74. Dr. Krieger promised to conduct the planned surgery but changed the agreement using underhanded tactics, forcing the plaintiffs to agree under duress without a new contract or even a record that we authorized.

75. The contracted procedure would have resulted in a full recovery based on medical evidence.

76. Because Dr. Kriger agreed to fulfill a contract he knows he cannot, is fraud. He had no intentions of sticking to the agreement and knew he would profit more if he did not. He turned one surgery into three with a 30% increase from CCS. There is no evidence to suggest Dr. Krieger did not know he would violate the contract before the surgery. His story of Dr. Bloch calling him during surgery with this last-minute change does not make sense.

## THIRD CAUSE OF ACTION

## CONCEALMENT

### (By the plaintiff's Kimberly Clisbee against all defendants)

77. Elaborate measures were used to conceal the accurate diagnosis. We were told Leilani had the rarest form of cancer never seen in a child at CHLA and only four other infants in medical history. The last was in 1980. We were told Leilani would be the subject of study and that the research conducted on her would help other kids with this type of cancer and help doctors understand it better for future cases. We were visited by the Pediatric Brain Tumor Society sent to us by Dr. Epstein. We are still members. We were told we had to have Oncology as the lead on our medical case because Leilani was a cancer patient, yet she was never treated. They played the fake diagnosis up to the extreme. Yet, no articles are published on this medical miracle by any of the doctors, nor is there proof of cancer.

78. Leilani could only see doctors approved by the groups, like Dr. Mona Shah, who confirmed the lie and built up the doctors so I would trust and believe them.

79. Leilani could only attend the school Dr. Bloch arranged, not her home school or the one we chose.

80. Everything had to go through Dr. Bloch. He managed her, and according to the county, all her CCS and regional center Leilani's records before 2019 have been deleted.

81. Dr. Epstein, at the last clinical meeting in 2016-7, when asked directly about cancer and told her I was reading up on it and wanted to understand why Leilani never received chemo or radiation, she said, "It might not have been cancer with stage 2 it's hard to tell, it could have been just TSC we can change the primary diagnosis". I asked, "So you're saying she never had cancer?" Dr. Epstein took back her statement and insisted Leilani did have cancer, then

refused to see her again in the clinic.  At our next appointment, I asked Dr. Kriger the same thing, and he assured me the cancer diagnosis was correct, that chemo is not always given to infants as it can kill them.  I was told this was untrue at UCLA in 2019 by Dr. Fallah and numerous other doctors afterward. Chemo and radiation are always given, especially when there is more than one cancer surgery. I was told the chemo and radiation would have come first because Leilani was not critical.

82. Dr. Bloch's assistant had Leilani's CCS diagnosis as Cerebral Palsy. She said the cancer was not a CCS-eligible condition, and they needed a code to bill under. When I asked why cancer could not be the cause, she said, "Cancer does not cause physical disabilities, and to get paid, we need a CCS-eligible diagnosis."

## FOURTH CAUSE OF ACTION

## GROSS NEGLIGENT

### (By the plaintiff's Kimberly Clisbee against all defendants)

83. Dr. Kreiger did not care about the cancer diagnosis being fake or that he promised to conduct surgery. Otherwise, he would not have done it twice.

84. Dr. Kriger did injure a baby and caused it life-long disabilities and did not care because he did it twice.

85. He then watched her suffer from his injuries for a decade and was unempathetic.

86. Dr. Krieger did not care; he took Leilani's life and devalued us as humans based on his reaction when confronted.

87. Dr. Kriger did not care; he violated the Hippocratic oath not to harm and did just that—multiple times.

88. Dr. Krieger knew the consequences of changing Leilani's surgery but did it anyway.

89. Dr. Kriger knew he was not qualified to conduct a hemispherectomy but contracted to do it anyway.

90. The defendants knew the consequences of Dr. Kriger's actions and went along.

91. The defendants knew Leilani needed to go to UCLA for a hemispherectomy but let the modified surgery happen anyway.

92. The defendants knew the cancer diagnosis was a fraud, and Dr. Kriger could not perform a hemispherectomy but still went with it.

93. The defendants knew Dr. Kriger injured a baby and caused it life-long disabilities and did not care because they participated in it with him twice.

94. The Defendants knew Dr. Krieger was not certified to conduct a hemispherectomy but allowed him to schedule one and lied about his ability.

95. The defendants knew they could test for TSC but refused to because they knew the truth.

96. The defendants knew what they were doing was immoral and unlawful because they are

doctors, know right from wrong, and were taught in school that insurance fraud is illegal.

97. Dr. Platt had us inject intermuscular ACTH medication in our one-month-old instead of

giving us a nurse because the county refused to pay. This procedure required an RN license,

and the medication cost 25K a vial. was walked to my refrigerator with white gloves and

almost killed Leilani.

98. After a week on the ACTH, Leilani became so sick that her blood pressure was 190/96. She

was close to having a heart attack, so Dr. Shah told us to go to CHLA, and she would call

Dr. Platt and tell her we were coming.  Dr. Platt met us in the ER and refused to admit her.

The medication is not in her record, nor is this visit. We were put in a backroom and left

there until Leilani stabilized, then sent home.

99. After seeing the damage of the first surgery, Dr. Krieger conducted another, but this time

forced Leilani out of the hospital sick with hydrocephalus.

100.    After seeing the damage from the first surgery, the other defendants maintained the false

diagnosis and allowed Dr. Krieger to perform another procedure.

101.    Dr. Bloch knew he had no right, authority, or medical expertise to stop, change, interfere

with, or dictate Leilani's surgical care. He is only a pediatrician.

102.    Knowing the consequence, Dr. Bloch refused to authorize a shunt for Leilani. Medi-Cal

would have paid for it, as they did in 2019 when CCS was removed from Leilani's case, but

he abused his power, intercepted all of her referrals, and decided on them without DHCS.

103.    Dr. Bloch would not let Leilani stay in the hospital more than 24 hours after her second

brain surgery. She was only three months old, had brain surgery a month before, and was not

allowed any draining or pain medication. Dr. Krieger refused to communicate with me in the

hospital. And Leilani was forced to leave throwing up, with a fever and diarrhea—all signs

of hydrocephalus. Leilani had a seizure every ten minutes after that surgery. A million times

worse than before.

104.    Dr. Kriger refused to conduct any more surgery or investigate the new seizures. I was

told they needed to get her medication right so the seizures caused by the surgery could

suppress. However, what was happening was that the required hydrocephalus to injure

Leilani's brain was doing its work, and they left her in that state for six months, causing her

to deteriorate and develop Cerebral Palsy "like" disabilities.

105.    When I threatened to take Leilani to Boston for a second opinion, Dr. Platt told us Dr.

Krieger was not certified to perform a hemispherectomy but would like Leilani to be his

first. I said no, and Dr. Platt arranged surgery at CHOC for us.

106.    The defendants ignored Leilani's illness in 2018 and refused care, knowing she was

dying.

107.    Dr. Bloch tried to stop Leilani from getting care at UCLA by denying the referrals

personally.

108.    Dr. Racheal Thompson cut Leilani's leg three inches short, making her unable to walk or

stand.

109.    Dr. Fallah of UCLA implanted a shunt and then refused further care because UCLA did

not want to get "involved."

110.    Dr. Sun told me I could remove Leilani's cranial staples with a staple puller because he

refused to remove them, knowing it could kill her, cause tremendous pain, and cause

infection.

111.    The county refuses to help Leilani reestablish care in alternative hospitals and gain

access to medical providers who deny care like UCLA because Dr. Bloch and Dr. Long are

in charge and two of Leilani's abusers.

## FIFTH CAUSE OF ACTION

## UNJUST ENRICHMENT

### (By the plaintiff's Kimberly Clisbee against all defendants)

112.    Leilani's condition creates revenue for the defendants and: Quest Diagnostics, National Seating107, and Mobility, Palmdale School District, the Department of Education, The Regional Center, the Department of Developmental Services, the county of Los Angeles, UCLA, and all of her doctors, CHLA and a doctor in every department (not anymore, but for many years), Sheild Healthcare, home nursing agencies, Stanford and a dozen doctors there, DME vendors, and many others.

113.    Dr. Kriger was paid for four brain surgeries that caused my child lifelong disabilities and was paid millions of dollars to do it based on the cost of one brain surgery.

114.    Several other doctors conducted surgeries Leilani would not have needed if it weren't for Dr. Krieger's injuries. They were spreading out the profit to create an alliance.

115.    CCS and the Regional Center became part of State policy in 2020 thanks to Dr. Bloch's project making 9 billion dollars a year in Federal funding.

116.    Leilani has nine specialists who regularly get paid to see her in the clinic.

117.    The defendants caused our pain and suffering; they will forever profit, and we will forever suffer the repercussions of their actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For general, specific, compensatory, incidental, and consequential damages

according to proof at trial, by court judgment, or settlement by the defendants without a jury trial, but in

an amount not less than one-hundred-fifty million dollars.

2. For disgorgement and restitution of all profits and gains obtained by the unlawful,

unfair, and fraudulent acts and omissions alleged herein according to proof.

3. For punitive and exemplary damages according to proof;

4. For pre-and post-judgment interest, as allowed by law;

5. For further relief as the Court may deem proper.


## DEMAND FOR SETTLEMENT

Plaintiffs demand a trial of all issues by jury in Federal Court if the defendants are unwilling to settle.

I do not want a trial. I am self-representing and had an emotional breakdown over this already. I am a mess, and my child does not have the time. She must get to Boston Children's, where they await her.

These crimes are not only civil but criminal as well and deserve the attention of the Federal courts. These individuals need to go to prison and stop using citizens of California like they did in the Tuskegee study to steal from the Federal government.

Date: 9/17/2023

By: Kimberly Clisbee